IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>PUERTO RICO HOSPITAL SUPPLY, INC.<br><br>    Debtor | CASE NO.   19-01022 (ESL)<br><br>CHAPTER  11 |
| IN RE:<br><br>CUSTOMED, INC.<br><br>    Debtor | CASE NO.   19-01023 (ESL)<br><br>CHAPTER  11 |
| BANCO SANTANDER PUERTO RICO<br><br>     Plaintiff<br><br>vs.<br><br>PUERTO RICO HOSPITAL SUPPLY, INC. AND CUSTOMED, INC.<br><br>     Defendants | ADV. PROC. No. 19-00448 (ESL)<br><br>FILED & ENTERED ON APR/03/2020 |

## OPINION AND ORDER

The instant adversary proceeding is before the court upon the motion to dismiss the complaint for failure to state a claim upon which relief may be granted filed by the Debtors and Defendants, Puerto Rico Hospital Supply, Inc. ("PRHS") and Customed, Inc. ("Customed") ("Defendants"), pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to adversary proceedings by Fed. R. Bankr. P. 7012(b) (Docket No. 13).  The motion to dismiss has been opposed by plaintiff, Banco Santander Puerto Rico ("Santander"), in its capacity as agent of Santander Financial Services, Inc., and Firstbank Puerto Rico, the loan lenders ("Lenders") (Docket No. 23).

The defendants replied to Santander's opposition, and Santander surreplied (Docket Nos. 28 & 32).

The court will first address the factual and legal allegations in the complaint, then state the position of the parties, and ultimately analyze the parties' arguments in light of the applicable law. The court advances that the legal issue in this case, in the bankruptcy context, has not been clearly addressed in this district.

**The Complaint**

Santander filed the present action seeking declaratory relief to determine the extent of its lien over property of the Defendants, specifically, the proceeds obtained by the Debtors/Defendants in an arbitration proceeding concerning the distribution rights against Johnson and Johnson International, Inc. and Etichon, Inc. (collectively "J&J") in an award confirmed by the U.S. District Court for the District of Puerto Rico in case number 17-01405 (FAB), as well as any proceeds in another pending case, case number 17-02281 (DRD). Santander alleges that the relevant facts are uncontested as the same have been stipulated in the Cash Collateral Stipulation and informs that a decision on this matter is critical as the proposed Chapter 11 plan does not provide for payment of said funds to Santander.

On April 28, 2017, the Debtors entered into a Credit Agreement (Revolving Line of Credit and Letters of Credit) (the "Credit Agreement") with Banco Santander Puerto Rico and FirstBank Puerto Rico (collectively, the "Lenders"), pursuant to which the Lenders provided a certain credit facility to the Borrowers in the amount of $32,000,000.00 (the "Loan"). The Loan is evidenced by the loan documents (collectively, the "Loan Documents" or the "Collateral") stipulated in ¶ 1 of the Cash Collateral Stipulation, Bankr. Case No. 19-01022-ESL11, Docket No. 65 (the "Cash Collateral Stipulation.").

As part of the Collateral Documents, Borrowers executed a (i) Security Agreement; (ii) Pledge and Assignment of Account; (iii) Mortgage Notes Pledge and Security Agreement; and (iv) UCC-1 Financing Statements; among others, as listed in the Credit Agreement, Section 5 at p. 32. This fact was Stipulated in ¶ 2 of the Cash Collateral Stipulation.

To secure their obligations under the Credit Agreement, Debtors granted the Lenders, through the Security Agreement (the "Security Agreement"), a first priority security interest over, among other assets of the Debtors, their inventories, accounts receivable, general intangibles, such as contract rights, and any proceeds thereof. This fact was Stipulated in ¶ 3 of the Cash Collateral Stipulation. The Lenders properly perfected their security interests over the Collateral granted by the Debtors under the Security Agreement by filing the corresponding UCC-1 Financing Statements. This fact was Stipulated in ¶ 4 of the Cash Collateral Stipulation.

On March 28, 2017, J&J filed a Complaint against the Debtors claiming that the latter failed to pay over $4.244 million in past due product purchases, in violation of its essential payment obligations, and requested a declaration from the Court to the effects that it had just cause to terminate its commercial relationships with the Debtors.

The Debtors moved to compel arbitration based on a clause in certain Non-Exclusive Distribution Agreement (the "2005 Contract") which provides for the arbitration of claims before the American Arbitration Association ("AAA"). On July 10, 2017, the Court entered an order compelling arbitration. On May 2, 2019, the Panel issued an award in favor of Debtors and against J&J in the amount of $1,184,598.19 (the "J&J Award"). On September 30, 2019, the Court confirmed the J&J Award.

On November 6, 2017, Debtors filed a separate complaint against J&J for violations to Law 75 alleging J&J's termination without just cause of an exclusive distribution agreement they maintained since 1990 (the "1990 Agreement"). See, Civil Case No. 17-02281(DRD) ("the Second Case"), collectively with the First Case, the "J&J Litigation"). Debtors asserted, among other damages suffered, lost benefits, loss of profits, loss of goodwill, the value of unsold inventory, and the value of capital investments to the extent those cannot be used for another business activity, which damages are estimated to exceed $10 million, exclusive of interests, costs, attorney's fees, and expert witness fees. Id. On April 10, 2019, the Court stayed the Second Case due to Debtors' bankruptcy filings.

The legal analysis in the complaint adduces that pursuant to the Security Agreement and the UCC-1 Financing Statements, Santander has a perfected lien over, among other collateral, the general intangibles of the Debtors, contract rights and proceeds arising therefrom. Santander alleges that Debtors ratified the validity and perfection of Santander's lien through the Cash Collateral Stipulation. Furthermore, Section 9-102 of the Uniform Commercial Code of Puerto Rico provides, in pertinent, that "proceeds" means whatever is collected on, or distributed on account of, collateral and rights arising out of collateral. 10 L.P.R.A. §2212. Santander concludes that its lien extends to all contract rights of the Debtors and proceeds thereof, including but not limited to the J&J Award, the J&J Litigation and any other proceeds obtained by the Debtors arising from contract rights or general intangibles.

Santander further contends that Debtors' claims from which the J&J Award arose were premised on a contract between J&J and the Debtors, the 2005 Contract. Specifically, that Debtors' claims for loss of profit and inventory under Law 75 relate directly to the 2005 Contract with J&J, and, as such, the contract is integral to these claims. The Debtors received compensation for the termination of a contract, the exercise of a right that existed pre-petition, and as such, represent proceeds of the pre-petition collateral. Debtors' claims against J&J are pre-petition claims that fit the definition of a contract right and general intangible under the Puerto Rico Uniform Commercial Code and are therefore subject to Santander's lien based on the Security Agreement and Financing Statements. Thus, it follows that Santander's perfected security interest in Debtors' general intangibles, contract rights, and proceeds thereof apply to the J&J Award.

The allegations in the complaint state that the Johnson & Johnson Litigation is ongoing, and it stems from both the 1990 Contract and the 2005 Contract. As such, the contract is integral to these claims. Section 9-102 (64) of the Uniform Commercial Code of Puerto Rico provides, in pertinent, that "proceeds" means whatever is collected on, or distributed on account of collateral, rights arising out of collateral, and all claims arising out of the loss of, or damage to the collateral. See, 19 L.P.R.A.§2212. Therefore, Santander's collateral consists of, among other things, Debtors' general intangibles, contract rights, and proceeds thereof.

-4-

Santander seeks a declaration from the Court as to the extent of its lien over Debtors' property, specifically, over the Debtors' contract rights and general intangibles, including but not limited to the J&J Award and the J&J Litigation, and any other awards, judgments or proceeds arising from Debtors' contract rights.

### Position and Argument of the Parties

### Defendants – Movants in the Motion to Dismiss

Debtors/Defendants have moved for the dismissal of the complaint on the ground that the same fails to state a claim upon which relief may be granted.  Defendants do not question the factual allegations in the complaint but disagree with the legal inferences drawn by plaintiff from the same.

Defendants' first argument is that claims for relief are tortious in nature because a principal's termination without just cause of the relationship is a tortious act under Puerto Rico Law 75, 10 L.P.R.A. §§ 278-278e. The statute provides in section 278b that "if no just cause exists for the termination of the dealer's contract for detriment to the established relationship, or for refusal to renew the same, the principal shall have executed a tortious act against the dealer." Defendants cite to decisions supporting said characterization. Defendants contend that Santander may not discard the tortious nature of Law 75 claims as the same are clearly stated in the Puerto Rico Law 75 statute.  The public interest of Law 75 is remedial in nature and must be liberally interpreted. 10 L.P.R.A. §278(c).  The strong public policy is directed to "leveling the contractual conditions between two groups financially unequal in their strength." Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d 817, 820 (1st Cir. 1988), quoting Walborg Corp. v. Tribunal Superior, 104 DPR 184, 189 (1975).

The Secured Transactions Chapter of the Commercial Transactions Act of Puerto Rico, 19 L.P.R.A §§ 2211-2409, does not allow for the creation of liens on claims arising in torts, except for commercial tort claims.  In order for a commercial tort claim to be allowed, there are certain conditions and restrictions.  The allowance of a commercial tort claim must be identified and described with specificity in the security agreement and the financing statement. 19 L.P.R.A. §

2234. A general reference to collateral as defined in the Commercial Transactions Act will not suffice. In re American Cartage, Inc., 656 F.3d 82, 88 (1st Cir. 2011).

Defendants' second argument is that a lien cannot be acquired over commercial tort claims as after-acquired property. "A security interest does not attach under a term constituting an after-acquired property clause to...(2) a commercial tort claim." Section 9-204 of the Commercial Transactions Act, P.R. Laws Ann. tit. 19, § 2234. "Furthermore, an after-acquired property clause in a security agreement cannot create a security interest in a commercial tort claim. The claim must already exist when the parties enter into the security agreement." American Cartage, 656 F.3d at 88."

Defendants further argue that "[t]wo important consequences follow from this. First, they had to be specified in the security agreement to be covered by Santander's lien. See Sec. 9-108(e)(1) of the Commercial Transactions Act, P.R. Laws Ann. tit. 19, § 2218, supra. Second, Santander's alleged lien on Debtors' accounts, contract rights, general intangible, accounts receivable, inventory, etc. cannot reach them as after-acquired property. See Sec. 9-204 of the Commercial Transactions Act, P.R. Laws Ann. tit. 19, § 2234, supra. In addition to these two consequences, *American Cartage* holds that Debtors' commercial tort claims cannot be considered "proceeds" of secured collateral for Santander's security agreement."

Defendants posit that the allegations in the complaint to the effect that the security agreement covers the Law 75 claim "should be disregarded as legal labels or conclusions or mere recitations of elements of the cause of action, far from well-pleaded facts. Whether the Debtors' Law 75 claims are general intangibles, contract rights, or proceeds from such collateral, and whether they are claims in contract or tort are legal conclusions." Defendants argue that the court is not bound to accept Santander's legal conclusions in the complaint and should ignore them when deciding the motion to dismiss.

Defendants also argue that Santander incorrectly alleges that Law 75 claims concern contract rights as it ignores the current definition of an account under the Uniform Commercial Code and the Uniform Commercial Code of Puerto Rico. The revised versions do not include

contract rights as an account. The definition of "contract right" in Article 9 of the Uniform Commercial Code is "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." This definition plainly does not include Debtors' Law 75 claims for damages because of a termination without just cause as the damages do not arise from a "right to payment under a contract not yet earned by performance." Under Article 9, the Uniform Commercial Code, and the Uniform Commercial Code of Puerto Rico, commercial tort claims are expressly excluded from the account definition. Santander's conclusory allegations that any recovery on it is a general intangible under UCC Article 9 is inconsistent with the definition of general intangible in the Uniform Commercial Code of Puerto Rico, 19 L.P.R.A. §2212. A law suit under Law 75 is not a general intangible subject to Santander's lien. Defendants cite to American Cartage in support to their position that "the commercial tort claim itself is not proceeds and a secured creditor has no right to it, even when the claim has been previously assigned as security to the creditor." American Cartage, 656 F.3d at 89. "[W]hen a party has an interest in a commercial tort claim as proceeds, what the secured party has is a right to the recovery, not a right to the claim itself."

Defendants also contend that Santander's arguments are based on law from other jurisdictions and that Debtors'/Defendants' Law 75 claims should be considered under Puerto Rico Law. Under Puerto Rico Law, a Law 75 action for damages is independent of any contract's provisions. La Electronica, Inc. v. Electric Storage Battery Co., 260 F. Supp. 915, 916 (D.P.R. 1966) ("the very purpose of the Act under which this action has been brought is to permit the enforcement of certain rights independent of the agreement itself"). A Law 75 claim does not require the existence of a formal or a written contract as a precondition. Under Law 75, a "dealer" (or distributor) is a "[p]erson actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." 10 L.P.R.A. § 278(a). A dealer's contract is defined as a "[r]elationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former

-7-

actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico." Id.,§ 278(b). In summary, Defendants conclude the following:

"Overall, these cases cited by Santander for the proposition that a lawsuit may be considered a general intangible are beside the point. It is uncontroverted that the definition of "general intangible" in Puerto Rico Chapter 9 includes "things in action." See P.R. Laws Ann. tit. 19, § 2212. Other sorts of property are expressly excluded from the definition, however, among them commercial tort claims. Id. As a result, Debtors' claims against J&J are excluded from the scope of "general intangibles," regardless of whether "things in action" may generally be considered so. The issue for Santander's complaint is not whether the arbitration award and any eventual recovery in the pending federal lawsuit between Debtors and J&J are the result of a lawsuit but whether they are the result of a commercial tort claim. Since on this point, Puerto Rico Law 75 and Chapter 9 are clear and categorical that the commercial tort claims are excluded from the definition of accounts, contract rights, and general intangibles, the case law cited by Santander for the proposition that some lawsuits may be general intangibles is superfluous or inapposite."

Defendants, in their reply to the opposition filed by Santander which is summarized below, stress that the applicable statute bars claims arising in tort, 19 L.P.R.A. §2219(d)(12); and that a partial exception is made for commercial tort claims, for which strict conditions are required, and Santander failed to meet the same, 19 L.P.R.A. §§ 2218, 2234. They also allege that the definition of commercial tort claims in 19 L.P.R.A. § 2212 has no reference to extracontractual claims and limits itself to claims arising in tort.

Defendants argue that Santander's contention that a claim should be considered contractual or extracontractual may be relevant in a case where an action is filed under Puerto Rico's general tort statute, Article 1802 of the Civil Code, 31 L.P.R.A. § 5141. Law 75, as a special law, prevails over the Civil Code. Claims for damages caused by a breach of contract arise under Article 1054 of the Civil Code, 31 L.P.R.A. § 3018, which provides that "[t]hose who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby." However, Law 75 imposes a liability for damages arising from acts that go beyond the "stipulations" or terms of a contract, and indeed despite them. "[A]n action for

-8-

damages for breach of contract (sec.1054) only lies when the damage suffered exclusively arises as a consequence of the breach of an obligation specifically agreed upon." Ramos Lozada v. Orientalist Rattan Furniture Inc., 130 D.P.R. 712, 727 (1992). The concurrence of tort and contract claims arising from the same events is well-settled in Puerto Rico law. Ramos Lozada, 130 D.P.R. at 727.

Santander's lien does not extend to Law 75 claims, nor to amounts recovered as a result of them. First, by virtue of the provisions of Chapter 9 and Law 75, Debtors' claims against J&J are commercial tort claims excluded from the reach of Santander's lien. "In re American Cartage, Inc., 656 F.3d 82 (1st Cir. 2011), holds that Santander's lien cannot reach the Law 75 claims as proceeds from any original collateral." Defendants argue that American Cartage in dicta leaves open the question of whether amounts recovered from a commercial tort claim may under certain circumstances be proceeds of some other original collateral. However, even if correct, which they do not admit to being so, the Debtors' bankruptcy filings before the rendering of any arbitration award or judgment on those claims impedes Santander's lien from reaching the amounts recovered by Debtors as a result of the claims as a post-petition recovery.

### Plaintitiff's/Santander's Opposition to Motion to Dismiss

Plaintiff responds by stating that the allegations in the complaint are that the Debtors' claims against J&J arise from the distribution agreements purportedly terminated without just cause. The Complaint alleges that the contracts with J&J are undeniably part of the Lenders' collateral and that the proceeds thereof, which include the eventual payment of the award or judgments against J&J, are also part of BSPR's collateral. Santander concludes that the Complaint has sufficient well-pleaded facts to survive a motion to dismiss under the Rule 12(b)(6) standard.

Santander alleges that the "claims against J&J arise under the contracts encumbered by Lenders' lien, and, therefore, any right to eventual payment pursuant to awards or judgments arising therefrom are also part of the Lenders' collateral as proceeds. In other words, pursuant to the allegations in the Complaint the payments to be received by Debtors for those awards or judgments are, at bottom, proceeds of the Lenders' collateral covered by their duly perfected security interest."

Santander admits that there is no clear precedent in this district regarding whether the payments received or to be received by Debtors as a result of the termination without cause of a distribution agreement pursuant to Law 75 are part of a lender's collateral. However, it is Santander's position that they are collateral subject to the valid lien it holds against property of the Debtors.

Santander's argument is that its lien extends to the proceeds of each claim, not to the claim itself. It is the end product of those actions that constitute proceeds, over which Santander maintains a valid and perfected pre-petition lien. Complaint at ¶46. What constitutes "proceeds" is in "Chapter 9 of the Puerto Rico Commercial Transactions Act ("PR-UCC"), which adopts Revised Article 9 of the Uniform Commercial Code. Section 9-102(64) of the PR-UCC defines "proceeds" as including whatever is collected on, or distributed on account of collateral, rights arising out of collateral, and all "claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral." P.R. LAWS ANN. tit. 19, § 2212 (emphasis supplied.) Furthermore, the Official Comments to the Uniform Commercial Code explain that a security interest in a tort claim also may exist under [Revised Article 9] if the claim is proceeds of other collateral." U.C.C. § 9-102, cmt. 5(g)."

Santander alleges that the definition of proceeds in the PR-UCC does not exclude tort claims and "much less a right to payment under an arbitration award or judgment arising out of the termination of a contract that is subject to a valid security interest, regardless of the underlying basis. This point is further confirmed by the U.S Court of Appeals for the First Circuit's opinion in In re American Cartage, Inc., 656 F.3d 82 (1st Cir. 2011), which Debtors grossly misinterpret. There, the Court of Appeals discussed the distinction between "commercial tort claims" and "proceeds" under Massachusetts' iteration of Article 9 of the Uniform Commercial Code." Santander includes the following in a footnote with the definition of proceeds in 19 L.P.R.A. §2212:

> 64) Proceeds, except as used in § 2369(b) of this title, means the following
> property:

(A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

(B) whatever is collected on, or distributed on account of, collateral;

(C) rights arising out of collateral;

(D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of defects or infringement of rights in, or damage to, the collateral, or

(E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

Santander cites to In re American Cartage, Inc., 656 F.3d 89, to support its contention that a commercial tort action are proceeds of the original collateral.

". . . Viewed as a whole, Article 9 teaches that when a party has an interest in a commercial tort claim as proceeds, what the secured party has is a right to the recovery, not a right to the claim itself. An action for conversion is not proceeds; only the end product of that action—the settlement amount or award—constitutes proceeds."

In summary, Santander states that it

"seeks a declaration from this Honorable Court to the effects that BSPR has a security interest over the proceeds obtained by the Debtors as a result of the arbitration award and other judicial proceedings against J&J concerning its distribution rights under certain distribution contracts. To be clear, BSPR is not asserting a security interest over the Law 75 claim itself, rather, it asserts that its security interest extends over the proceeds resulting from the arbitration award, future awards, and judgments arising from or related to Debtors' distribution contracts, regardless of the basis of the underlying claim -that is, the right to receive the payment of the end product of those judicial actions. BMW Fin. Servs., NA, LLC v. Rio Grande Valley Motors, Inc., 2012 WL 4623198, at *10 (S.D. Tex. Oct. 1, 2012) (noting that "the definition of proceeds does not exclude commercial tort claims" and the relationship between the claims and franchise rights in that case "illustrate[d] how settlement of those claims falls squarely within the definition of 'proceeds"); Breckenridge Edison Dev., L.C. v. Sheraton Operating Corp., 2015 WL 5459833, at *5 (S.D.N.Y. June 2, 2015) (noting that Revised Article 9 of the Uniform Commercial Code allows a security interest in a tort claim if proceeds of other collateral.)"

Santander further alleges that the Debtors' claims against J&J are contractual in nature and subject to its lien. The Law 75 statute cited by the defendants provides that if no just cause exists for the termination of the dealer's contract for detriment to the established relationship, or for the refusal to renew the same, the principal shall have executed a "tortious act" against the dealer. P.R. Laws Ann. Tit. 10 §278b. The phrase "tortious act" contextually means "that such act is sanctionable, improper, incorrect and punishable, but it does not convert a breach of contract into an extra-contractual claim." The 1965 amendments to Law 75 and Rule 4.7 of the Rules of Civil Procedure of Puerto Rico are intended to protect local dealers from damages resulting out of the principal's termination or refusal to renew a distribution contract. Law 75 protects a contract. "What Law 75 defines as tortious is the act of terminating or refusing to renew a distribution contract, not the cause of action resulting therefrom."

Santander states in the preliminary statement of its surreply that:

"This case was filed to determine the extent of the Lenders' lien over the property of Puerto Rico Hospital Supply, Inc. and Customed, Inc. (collectively, "Defendants"). The determination of the extent of Lenders' lien depends on whether the security interest they maintain over Defendants' property, specifically Debtors' rights arising from the distribution agreements it maintained with Johnson and Johnson, Inc. ("J&J"), are covered by such security interest. Therefore, the issue before the Court is a question to be resolved under the applicable PR-UCC provisions governing the perfection and extent of Lender's lien to secure payment of a loan."

The court agrees with such summary, particularly that the issue before the court must be resolved under applicable Puerto Rico law to determine the extent of Santander's lien over the funds obtained by the Debtors under tort actions pursuant to Law 75, the Puerto Rico Dealer's Contracts Act, 10 L.P.R.A. §§ 278a – 278e. Santander expressed the following conclusion and concern over a decision in favor of Defendants:

"Regardless of the nature of those claims, any award and/or judgment resulting from the aforesaid litigation will be compensatory in nature and substitute the proceeds that Defendants, the distributor, would have generated if the distribution agreements had not been terminated. In essence, any compensation constitutes proceeds of the original collateral –the distribution agreements.

-12-

Adopting Defendants' interpretation of the PR-UCC will lead to rendering security interests over distribution agreements in Puerto Rico unenforceable. The Defendants interpretation is absurd because it purports to have the Court determine that a cause of action for termination of a distribution contract should be considered a commercial tort under the PR-UCC and, therefore, should not be covered by a perfected security interest. Such a ruling would destabilize the economy as no lender would be amenable to provide credit facilities to distributors who, like Defendants in this case, have a business which essential assets and its mean to generate income include distribution agreements."

**Jurisdiction**

This court has jurisdiction over the instant adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1), 157(b)(2)(K) and 1334. The subject matter is a core proceeding under 28 U.S.C. §157(b)(2). Venue is proper under 28 U.S.C. §§1408 and 1409.

**Standard of Motion Under Fed. R. Civ. P.12(b)(6) - Failure to state a claim upon which relief may be granted.**

"The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to assess the legal feasibility of a complaint, not to weigh the evidence which the plaintiff offers or intends to offer." Velez-Arcay v. Banco Santander de P.R. (In re Velez-Arcay), 499 B.R. 225, 230 (Bankr. D.P.R. 2013), citing Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2nd Cir.1984); Citibank, N.A. v. K-H Corp., 745 F. Supp. 899, 902 (S.D.N.Y. 1990).

Fed. R. Civ. P. 8(a)(2), applicable to adversary proceedings through Fed. R. Bankr. P. 7008, mandates that a complaint contains a "short and plain statement of the claim showing that the pleader is entitled to relief." "Although detailed factual allegations are not required, the Rule does call for sufficient factual matter". Surita-Acosta v. Reparto Saman Inc. (In re Surita-Acosta), 464 B.R. 86, 90 (Bankr.D.P.R. 2012). Therefore, to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter that, accepted as true, "state[s] a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has prima facie plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the alleged facts. Id. at 556. The Twombly standard was further developed in Ashcroft v. Iqbal, 556 U.S. 622 (2009), advising

-13-

lower courts that "determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679. "In keeping with these principles, a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. In sum, allegations in a complaint cannot be speculative and must cross "the line between the conclusory and the factual." Peñalvert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011). "[A]n adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 11 (1st Cir. 2011).

In Schatz v. Republican State Leadership Committee, 669 F.3d 50, 55 (1st Cir. 2012), the U.S. Court of Appeals for the First Circuit (the "First Circuit") established a two-step standard for motions to dismiss under Fed. R. Civ. P. 12(b)(6). Step one is to isolate legal conclusions. Step two is to take the complaint's well-pleaded (non-conclusory) allegations as true, drawing all reasonable inferences in favor of the plaintiff and determine if they plausibly narrate a claim for relief. Also see Pérez v. Rivera (In re Pérez), 2013 WL 1405747 at 3, 2013 Bankr. LEXIS 1561 at 9-10 (Bankr. D.P.R. 2013); Zavatsky v. O'Brien, 902 F. Supp. 2d 135, 140 (D. Mass. 2012); Guadalupe-Báez v. Pesquera, 2016 U.S. App. Lexis 7173, *7 (1st Cir. 2016).

Consideration of a motion to dismiss requires the court to assume the truth of all well-plead facts and give the benefit of all reasonable inferences therefrom. A complaint that states a claim plausible on its face survives a motion to dismiss.

### **Discussion**

There is no controversy regarding the factual allegations in the Complaint and the parties agree that that Puerto Rico law controls the legal issue before the court, that is, whether the legal conclusions in the Complaint are supported by the facts, entitling the Plaintiff for the relief it

seeks. There is no controversy over the fact that Santander is a lien creditor with a valid security agreement. Since the validity of the lien is not in question, the legal issue before the court is a determination over what collateral the lien extends to, specifically if the lien extends to all contract rights of the Debtors and the proceeds thereof, including any award resulting from the J&J litigation. The issue before the court must be resolved under applicable Puerto Rico law to determine the extent of Santander's lien over the funds obtained by the Debtors under tort actions pursuant to Law 75, the Puerto Rico Dealer's Contracts Act, 10 L.P.R.A. §§ 278a – 278e.

The court must isolate the legal conclusions to determine if they plausibly narrate a claim based on the factual allegations in the Complaint. To achieve this objective the court will engage in the following analysis: (1) Identify the content of the security agreement as it relates to the collateral given to guarantee the loan. The same is set forth in Section 2 of the Agreement "Grant of Security" which was attached as Exhibit 3 to the cash collateral stipulation; (2) detail the applicable statutory provisions to the legal controversy, principally Puerto Rico Law 75, 10 L.P.R.A. §§278a – 278e, and the Commercial Transactions Act of Puerto Rico, 19 L.P.R.A. §§2211 – 2409; (3) analyze the holding by the First Circuit in In re American Cartage, Inc., 656 F.3d 82 (1st Cir. 2011); and (4) reach a legal conclusion based on the previous three considerations.

### 1. The Security Agreement

Section 2 of the Security Agreement, Grant of Security, provides that the Debtors grant to the Lenders "a security interest in and to all of the Grantor's rights, title and interest in and to the following, whether presently held or hereafter acquired (collectively, the "Collateral")." There are four separate descriptions of the assigned collateral: (a) Accounts; (b) Inventory; (c) Fixtures; and (d) Products and Cash and Non-Cash proceeds of the foregoing Collateral. The two relevant to the legal controversy before the court are (a) Accounts and (d) Products and Cash. These two will be addressed in detail. Pursuant to the Security Agreement, references to the UCC in the Security Agreement are to the Puerto Rico Commercial Transactions Act, as amended, and in

effect on the date of the agreement; and any additional security over collateral not in Puerto Rico will be governed by the UCC in effect in such other jurisdiction.

"(a) All accounts (as defined in the UCC), receivables, accounts receivable, lease receivables, contract rights, chattel paper, drafts, acceptances, instruments, writings evidencing a monetary obligation or a security interest or a lease of goods, general intangibles and other obligations of any kind, now or hereafter existing, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services, and all rights now or hereafter existing in and all security agreements, leases, and other contracts securing or otherwise relating to any such accounts, receivables, account receivables, lease receivables, contract rights, chattel paper, drafts, acceptances, instruments, writings evidencing a monetary obligation, or a security interest or a lease of goods, general intangibles or obligations (collectively, the "Receivables"); and

. . .

(d) All products and cash and non-cash proceeds of any and all of the foregoing Collateral, including without limitation any rents, revenues, issues and profits arising from the sale, lease, license, exchange, disposition or transfer of any of the foregoing Collateral and, to the extent not otherwise included, all payments under insurance or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral."

Immediately following the description of the Collateral, in the last paragraph of Section 2 of the Security Agreement, there is the following statement: "The parties hereto agree that, except to the extent overridden by applicable law, those agreements that constitute a part of the Collateral, which by the terms thereof may not be assigned by the Grantors without the prior consent of the other parties thereto, shall not be deemed to have been assigned pursuant hereto and shall not be included within the Collateral until such time as all required consents to the assignment contemplated hereunder have been duly obtained."

-16-

The Collateral in the Security Agreement is broad and comprehensive, and does include contract rights, general intangibles, and proceeds. However, there is no specific reference to commercial tort claims. The court must determine if due to the tortious nature of an action under Law 75, which gives rise to a commercial tort claim, the commercial tort claim is clearly identified and described with specificity in the Security Agreement provisions regarding the Collateral given by the Defendants to the Lenders. The court finds that commercial tort claims are not clearly identified and described in the Security Agreement provisions regarding Collateral given by Debtors to Santander.

**2.   Statutory Provisions: Puerto Rico Law 75, 10 L.P.R.A. §§278a – 278e, and the Commercial Transactions Act of Puerto Rico, 19 L.P.R.A. §§2211 – 2409.**

The source of the funds in question is the litigation of the Debtors/Defendants against J&J for violation of the distribution rights under Law 75 resulting from the termination of their distribution relationship. The court will first address the provisions in Law 75 and then the provisions in the Commercial Transactions Act of Puerto Rico ("PR UCC").

Section 278a of Law 75 provides that "[n]otwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause." This section served as the basis for the actions before the U. S. District Court of Puerto Rico for the termination of the distribution contracts. Its applicability and extent are determined by the district court and not by the bankruptcy court in the case under consideration. This court only notes that the 1966 amendments added to the prohibition to "directly or indirectly perform any act detrimental to the established relationship." Such amendment strengthens the protection afforded to the dealer.

Section 278b provides for the award of damages for the termination of the relationship without just cause and states in its relevant part that "[i]f no just cause exists for the termination of the dealer's contract for detriment to the established relationship, or for the refusal to renew same, the principal shall have executed a tortious act against the dealer and shall indemnify it to the extent of the damages caused him, the amount of such indemnity to be fixed on the basis of

the following factors: . . ." This section creates and provides for the execution of a tortious act when the principal terminates the dealer's relationship without just cause. The damage factors are only a guide to determine the amount of damages to be awarded.  Marina Industrial, Inc. v. Brown Boveri Corporation,  114 D.P.R. 64 (1983). The damages for a tortious act based on factors in section 278b should be liberally construed in favor of the dealer.  Computer Systems Corp. v. General Automation, Inc., 599 F. Supp. 819 (D.P.R. 1984).

Section 278c states that "[t]he provisions of this chapter are of a public order and therefore the rights determined by such provisions cannot be waived. This chapter being of a remedial character, should, for the most effective protection of such rights, be liberally interpreted; in the adjudgment of the claims that may arise hereunder, the courts of justice shall recognize the right in favor of whom may, effectively, have at his charge the distribution of activities, notwithstanding the corporate or contractual structures or mechanisms that the principal or grantor may have created or imposed to conceal the real nature of the relationship established." Therefore, actions under Law 75 are of public order, unwaivable, remedial, to be liberally interpreted in favor of the dealer, when considering the adjustment of claims that may arise under Law 75.

The legal controversy before the court rests mainly on the provisions of the PR UCC. The court will first identify several key definitions in the PR UCC to then apply them to the operational and executory sections in the same. The PR UCC definitions are in 19 L.P.R.A. §2212. The relevant ones to the controversy before the court are:

> "(2) Account, except as used in account for, means a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a State, governmental unit of a State, or person licensed or authorized to operate the game by a State or governmental unit of a State. The term includes health-care-insurance receivables. The term does not include (i) rights to payment evidenced by chattel paper or an instrument, (ii) commercial tort claims, (iii) deposit accounts, (iv) investment property, (v) letter-of-credit rights or letters of credit, or (vi) rights to payment for money or funds

advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

. .

(9) Cash proceeds. Means proceeds that are money, checks, deposit accounts, or the like.

. . .

(12) Collateral. Means the property subject to a security interest or agricultural lien. The term includes:

(A) Proceeds to which a security interest attaches;

(B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold, and

(C) goods that are the subject of a consignment.

. . .

(13) Commercial tort claim. Means a claim arising in tort with respect to which:

(A) The claimant is an organization, or

(B) the claimant is an individual and the claim:

(i) Arose in the course of the claimant's business or profession, and

(ii) does not include damages arising out of personal injury to or the death of an individual.

. . .

(42) General intangible. Means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, life insurance policies, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.

. . .

(44) Goods. Means all things that are movable when a security interest attaches. The term includes (i) fixtures, (ii) standing timber that is to be cut and removed under a conveyance or contract for sale, (iii) the unborn young of animals, (iv) crops grown, growing, or to be grown, even if the crops are produced on trees, vines, or bushes, and (v) manufactured homes. The term also includes a computer program embedded in goods and any supporting information provided in connection with a transaction relating to the program if (i) the program is associated with the goods in such a manner that it customarily is considered part of the goods, or (ii) by becoming the owner of the goods, a person acquires a right to use the program in connection with the goods. The term does not include a computer program embedded in goods that consist solely of the medium in which the program is embedded. The term also does not include accounts, chattel paper, commercial tort claims, deposit accounts, documents, general intangibles, instruments, investment property, letter-of-credit rights, letters of credit, money, or oil, gas, or other minerals before extraction.

. . .

(61) Payment intangible. Means a general intangible under which the account debtor's principal obligation is a monetary obligation.

. . .

(64) Proceeds, except as used in § 2369(b) of title. Means the following property:

(A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

(B) whatever is collected on, or distributed on account of, collateral;

(C) rights arising out of collateral;

(D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral, or

(E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral."

After considering the disposition in section 278b of Law 75 establishing that a principal's infringement of a dealer relationship without just cause is a tortious act and the definition of commercial tort action in section 2112(13) of the PR UCC, the court concludes that the damages award in question constitute a commercial tort claim.

The Security Agreement includes in Section 2(a) "contract rights" as Collateral to the loan. "Contract rights" is defined in the 1962 version of the UCC as "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." Under the PR UCC there is no definition of "contract rights." The same arguably fall under the general definition of "account" in section 2112(2). However, even if "contract rights" as defined in the 1962 UCC may be considered as part of the Collateral, the same are not applicable to the funds obtained through the exercise of the tortious right of action under the Law 75 statute because the damages are the result of a tortious act and are not a payment under a contract not yet earned by performance. Therefore, the same are not proceeds to which the lien attaches.

Section 2218 of the PR UCC provides that "[e]xcept as otherwise provided in subsections (c), (d), and (e) of this section, a description of personal property is sufficient, whether or not it is specific, if it reasonably identifies what is described." However, under subsection (e) a description by type of collateral is an insufficient description when it concerns a commercial tort claim. The description in the Security Agreement is insufficient as it does not mention commercial tort claims.

### 3. In re American Cartage, Inc., 656 F.3d 82 (1st Cir. 2011).

The First Circuit in In re American Cartage considered a question "of first impression as to the distinction between 'commercial tort claims' and 'proceeds'" and concluded that the disputed claims were commercial tort claims. The secured creditor argued that the claims against the Debtor were proceeds of the collateral. The Debtor asserted that the disputed claims are commercial tort claims, not proceeds, and as such, are not covered by the security interest.

The First Circuit held that creditors' rights in bankruptcy arise from the underlying substantive law creating the debtor's obligation and that the underlying substantive law is the law of Massachusetts, a jurisdiction in which secured transactions are governed by a state-specific iteration of Article 9 of the Uniform Commercial Code (UCC). *See* Mass. Gen. Laws ch. 106, §§ 9–101 to 9–709. The panel found as uncontested that the Debtor gave a security interest to the lender in many of its assets; and that the question was whether the claims asserted "were caught up within the sweep of this security interest." This court notes that the issue before the First Circuit in In re American Cartage is substantially similar to the legal issue in this case.

The security interest in In re American Cartage extended to:

"all goods, inventory, equipment, accounts, accounts receivable, chattel paper, documents, instruments, contract rights, general intangibles, investment property, securities entitlements, deposit accounts, fixtures and other property, wherever located, now or hereafter belonging to [American Cartage] ... and in all proceeds, insurance proceeds, substitutions, replacement parts, additions and accessions of and/or to all of the foregoing."

The court notes that the collateral in the case before the court is more comprehensive and broader than the one described in In re American Cartage. However, neither specifically includes and describes a commercial tort action.

The claims in In re American Cartage are claims for conversion, interference with contractual relations, breach of fiduciary duty, and civil conspiracy. The First Circuit found that each of them sounds in tort. The claims in this adversary proceeding are a tort because the applicable statute specifically provides that the infringement of a dealership relation is a tortious act.

The First Circuit held that:

"Under Massachusetts law, commercial tort claims must be described with specificity in a security agreement in order to be considered part of that agreement.

-21-

Mass. Gen. Laws ch. 106, § 9–108(e)(1). This requirement places commercial tort claims in stark contrast to other kinds of collateral, which may be defined broadly by type as long as the description, even if not specific, "reasonably identifies what is described." *Id.* § 9–108(a). Furthermore, an after-acquired property clause in a security agreement cannot create a security interest in a commercial tort claim. *Id.* § 9–204(b)(2). The claim must already exist when the parties enter into the security agreement. *See id.* cmt. 4; *see also id.* § 9–108 cmt. 5."

In this case the applicable law is the PR UCC, which is in accord with the conclusion reached by the First Circuit in In re American Cartage.

In re American Cartage found that the security agreement did not specifically mention any commercial tort claims as no such claims existed when the security agreement was signed. In this case there is no specific reference in the Collateral to commercial tort claims and none existed at the time the Security Agreement was signed. This reasoning was adopted by the court in In re Alliance Insurance Group of Arkadelphia, Inc., 2019 WL 1992622, (W.D.Ark. February 12, 2019), holding that:

Because the tort claims that are at issue in this case were not specifically described in the parties' security agreements and, in fact, did not even exist at the time the security agreements were entered into, the Court finds that the banks' respective security agreements do not encompass the commercial tort claims that are at issue in this case. All commercial tort claims that existed when the debtor filed his voluntary petition remain property of the debtor's estate.

The First Circuit in In re American Cartage found that the secured creditor tried to characterize the claims as proceeds of collateral and held that "[t]his argument presents an issue of first impression in this circuit. The question is whether the right to pursue a commercial tort claim can be passed to a secured creditor as proceeds of original collateral. We conclude that it cannot." The reasoning involves the definition of proceeds. The First Circuit held that "we interpret the UCC and the case law to mean that the term 'proceeds' refers to the secured creditor's right to value derived from the collateral, not to the mere act of attempting to recover that value." The First Circuit reasoning was applied in In re Alliance Insurance Group of Arkadelphia, Inc. that concluded that "tortious interference with contractual relationship or conversion would necessarily be related to damage to the original collateral." Since the commercial tort claims in the case before the court were not specified and identified in the Security Agreement, the damage award is not related to the Collateral.

A key determination by the First Circuit in In re American Cartage and critical to the case before the court is the following:

> Of course, the UCC states that "[a] security interest in a tort claim ... may exist under this Article if the claim is proceeds of other collateral." U.C.C. § 9–102 cmt. 5(g). But this comment must be read in light of the UCC's statement that it is a right to payment from the resolution of a tort claim, and not the claim itself, that may constitute proceeds of collateral. "[Article 9] ... applies to assignments of 'commercial tort claims' ... as well as to security interests in tort claims that constitute proceeds of other collateral (e.g., a *right to payment* for negligent destruction of the debtor's inventory)." *Id.* § 9–109 cmt. 15 (emphasis added). Viewed as a whole, Article 9 teaches that when a party has an interest in a commercial tort claim as proceeds, what the secured party has is a right to the recovery, not a right to the claim itself. An action for conversion is not proceeds; only the *end product* of that action—the settlement amount or award—constitutes proceeds.

It is important to emphasize that in the above statement the First Circuit indicated that "when a party has an interest in a commercial tort claim as proceeds, what the secured party has is a right to the recovery, not a right to the claim itself." In order for the secured creditor to have a right to the recovery, as opposed to the claim, the party must have a right to the recovery. The right to recovery of a commercial tort claim under the PR UCC requires that the same be clearly identified and described in the security agreement. It was not so in this case. The First Circuit reasoned that " . . .treating commercial tort claims themselves as proceeds would blur any meaningful distinction between the two categories." Therefore, this court concludes that the commercial tort claim was not included in the Security Agreement as part of the Collateral and, thus, Santander does not have a right to the recovery of the funds resulting from the Johnson litigation.

### 4. **Legal Conclusion**

Section 278b of Law 75 creates and provides for the execution of a tortious act when the principal terminates the dealer's relationship without just cause. The damages award in question

-23-

constitute a commercial tort claim within the definition of commercial tort action in section 2112(13) of the PR UCC due to the tortious nature of an action under Law 75.

Commercial tort claims are not clearly identified and described with specificity in the Security Agreement provisions regarding the Collateral given by the Defendants to the Lenders. Section 2218 of the PR UCC provides that "[e]xcept as otherwise provided in subsections (c), (d), and (e) of this section, a description of personal property is sufficient, whether or not it is specific, if it reasonably identifies what is described."  Subsection (e) provides that a description by type of collateral is an insufficient description when it concerns a commercial tort claim. The description in the Security Agreement is insufficient as it does not mention commercial tort claims.

In re American Cartage held that a security agreement that does not specifically mention any commercial tort claims does not encompass the commercial tort claims that are at issue. In this case there is no specific reference in the Collateral to commercial tort claims and none existed at the time the Security Agreement was signed. Since the commercial tort claims in the case before the court were not specified and identified in the Security Agreement, the damage award is not related to the Collateral.

The court notes that the collateral in the case before the court is more comprehensive and broader than the one described in In re American Cartage. However, neither specifically included and described a commercial tort action.

In order for the secured creditor to have a right to the recovery, as opposed to the claim, the party must have a right to the recovery.  The right to recovery of a commercial tort claim under the PR UCC requires that the same be clearly identified and described in the security agreement.  It was not so in this case.

Therefore, this court concludes that the commercial tort claim was not included in the Security Agreement as part of the Collateral and, thus, Santander does not have a right to the recovery of the funds resulting from the Johnson litigation.

## CONCLUSION

In view of the foregoing, the court finds and concludes that the funds resulting from the J&J litigation are a commercial tort claim and that the same was not clearly identified and described in the Security Agreement. Therefore, the same are not Collateral. This legal conclusion

leads the court to determine that Santander's lien over the funds obtained by the Debtors under tort actions pursuant to Law 75, the Puerto Rico Dealer's Contracts Act, 10 L.P.R.A. §§ 278a – 278e are not proceeds to which the lien attaches. Thus, Santander's action does not plausibly give rise to an entitlement to the relief requested based on the factual allegations in the Complaint.

Consequently, the court grants Defendants' motion to dismiss. Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 3rd day of April 2020.



Enrique S. Lamoutte
United States Bankruptcy Judge

-25-